**KPMG PEAT MARWICK LLP, Plaintiff,**

v.

**Ted A. FERNANDEZ, Ulysses S. Knotts III, Allan R. Frank, and David A. Dungan, Defendants.**

**Civil Action No. 15570.**

Court of Chancery of Delaware,
New Castle County.

Submitted: Dec. 16, 1997.
Decided: Jan. 6, 1998.

R. Franklin Balotti, C. Malcolm Cochran, IV, and Claudia A. DelGross, of Richards, Layton & Finger, Wilmington; Richard J. O'Brien, Gerard D. Kelly, and Theodore T. Chung, of Sidley & Austin, Chicago, IL; John A. Shutkin, Deputy General Counsel, New York City, of counsel, for Plaintiff.

Pamela S. Tikellis, and James C. Strum, of Chimicles, Jacobsen & Tikellis, Wilmington; Michael A. Hanzman and S. Daniel Ponce, of Hanzman, Criden, Korge & Chaykin, P.A., Miami, FL; Michael D. Karpeles, of

Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Ltd., Chicago, IL, of counsel, for Defendants.

OPINION

LAMB, Vice Chancellor.

## I. INTRODUCTION

Plaintiff, KPMG Peat Marwick LLP ("KPMG") has moved for an order enforcing the terms of the settlement agreement it entered into on or about August 7, 1997 (the "Settlement Agreement") with the defendants in this action and several others ("Respondents") all of whom are former KPMG partners. KPMG seeks leave to conduct discovery to determine the scope of the Respondents' alleged breach of that agreement. Plaintiff, petitioner, also seeks an order extending for an additional six months the time period provided in the Settlement Agreement during which Respondents are required to abide by certain covenants not to compete.

■ As discussed below, the motion raises issues about the scope to be given to the operation of the non-compete provisions of the Settlement Agreement. Under Delaware law, a former employee's (or, as here, former partner's) agreement not to compete will be specifically enforced, in the proper circumstances, and is not void as against public policy, when its purpose and reasonable operation is to protect the legitimate interests of the former employer. *Research & Trading Corporation v. Pfuhl,* Del. Ch., C.A. No. 12527, Allen, C., 1992 WL 345465 (Nov. 18, 1992) Mem. Op. at 12–13. On the record before me, I find that there is insufficient evidence to support a finding that Respondents' conduct has violated the Settlement Agreement, as reasonably construed, or has interfered with the legitimate interests of KPMG in protecting its goodwill and business from Respondents' competitive activities. There is also insufficient evidence of a pattern of conduct violative of the terms of the Settlement Agreement to justify the intrusion of discovery into Respondents' business activities. Finally, there is no evidence of any material competitive injury to KPMG

resulting from Respondents' conduct. Thus, I deny KPMG's motion.

## II. BACKGROUND

This action arises out of the departure from KPMG of a group of partners engaged in the management advisory, or consulting services part of KPMG's practice. Those who departed did so for the purpose of organizing a competing consulting business, known as AnswerThink Consulting Group Inc. ("AnswerThink").

The KPMG partnership agreement, to which Respondents were parties, contains a broad non-compete provision, which provides, pertinently, as follows:

> A Partner ... shall not, except with the written permission of the Chairman, for a period of two (2) years after the date he or she ceases to be a Partner ('termination date'), directly or indirectly, solicit or service the Public Accounting (as such term is defined in this Agreement) work of any individual or organization for whom, during the three (3) years prior to and including the termination date, either he or she, or any office of the Firm located within seventy-five (75) miles of any office to which he or she was assigned, has performed services or with whom any such office of the Firm is negotiating for the provision of its services as of the termination date.

(Article III, Section 9(b)(i)) This provision of the KPMG partnership agreement was incorporated by reference into the Settlement Agreement at paragraph 2.1 thereof, which provides that for a period of two years beginning on December 31, 1996, Respondents and others associated with them "shall strictly abide by the terms of Article III, Section 9(b)(i) of the Articles of Partnership."

The Settlement Agreement also contains a provision regarding the solicitation and hiring of either KPMG or AnswerThink personnel, as follows:

> For a period of two years following December 31, 1996, [the Respondents and their associates shall not], either directly or indirectly, hire, retain, subcontract with, employ or use as an advisor or consultant

... otherwise contract with, or have any communications of any kind regarding the foregoing with any employee or partner of KPMG. For the same period, KPMG shall not directly or indirectly solicit any of the Departing Partners, the Departing Personnel, or employees of AnswerThink to join KPMG.

(Settlement Agreement, ¶ 3.1)

Neither party has raised, and the Settlement Agreement does not address, the confidentiality of KPMG's client lists, *per se.* Presumably, this flows from the fact that KPMG's audit relationship with its most important clients is itself a matter of public record. In any event, it is clear that Respondents are free to solicit work from KPMG's clients other than those described in Article III, Section 9(b)(i) of the partnership agreement.

The pending motion focuses on five incidents which, KPMG argues, demonstrate that Respondents have violated and, if not ordered to comply, will continue to violate the terms of the Settlement Agreement. In this regard, KPMG argues for an expansive reading of the terms of Article III, Section 9(b)(i) of the partnership agreement to prohibit respondents from having any contact with persons or organizations (i) for whom any of them performed services during the three year period prior to his or her termination, or (ii) for whom any work was performed during that period of time in the office where such partner was located or at any office of KPMG within seventy-five (75) miles of that office. KPMG also charges that Respondents violated the provisions of the Settlement Agreement barring them from soliciting employees or partners of KPMG.

In addition to contesting the factual bases of these alleged violations, Respondents contend that the terms of the Settlement Agreement and the partnership agreement must be read more narrowly than KPMG argues, reaching only persons and organizations with whom Respondents or other persons in their offices or in offices within seventy-five (75) miles thereof, had a significant client relationship. That is, Respondents take the position that if a particular person or organization was regarded as the "client" of a geographically distant office, for example, it should not matter that a small amount of work incidental to that representation was done at (or within 75 miles of) the office where he or she was located. If none of the Respondents was located at or within seventy-five (75) miles of that geographically distant office, Respondents argue, AnswerThink should be free to solicit business from that client.

I find that I am not able fully to embrace either side's position. KPMG's position renders the non-compete agreement unreasonably restrictive, both because it would apply the non-compete to clients with whom Respondents had no substantial relationship and because it would too narrowly limit the scope of contacts and activities permitted with clients subject to the non-compete. Respondent's position, by contrast, would exclude from coverage under the non-compete clients for whom Respondents worked so long as the client was regarded as the "client" of another office and, thus, might permit competition in situations where KPMG's legitimate interests justified its preclusion.

## III. DISCUSSION

### 1. *Employee Solicitation*

■ On September 30, 1997, a KPMG employee received a voice-mail message from an employee of a recruiting firm retained by AnswerThink. I assume, without deciding, that the contact was made for the purpose of soliciting the KPMG employee (or perhaps other KPMG employees) to become employees of AnswerThink. If authorized by AnswerThink, such contact would be expressly contrary to the terms of the Settlement Agreement.

Respondents submitted affidavits from both the Executive Vice President—Human Resources of AnswerThink and the owner of the management recruitment firm involved. These affidavits state that AnswerThink specifically instructed the recruiter not to solicit KPMG employees about the possibility of joining AnswerThink. According to the affidavit evidence, when the September 30, 1997 contact was brought to its atten-

tion, AnswerThink fired the recruitment firm. Reviewing all of the evidence before me, I conclude that the circumstances of the September 30, 1997 contact do not establish or suggest a violation of the Settlement Agreement by AnswerThink or Respondents.

### 2. *Dun & Bradstreet*

■ On September 9, 1997, the Senior Vice President and CFO of Dun & Bradstreet ("D & B"), a client of KPMG since 1993, wrote to KPMG's Deputy Chairman and COO requesting KPMG to consent to D & B's retention of AnswerThink as one of several organizations to work on D & B's Year 2000 project. The D & B letter includes the following statement: "It is important for you to understand that we initiated the contact with [AnswerThink]." Evidently, KPMG refused to consent. There is no dispute that D & B is a client falling within the ambit of the non-competition agreement.

KPMG argues that AnswerThink's conduct in regard to D & B both violated the terms of the Settlement Agreement and "harmed KPMG's relationship with D & B" by forcing KPMG to make the disagreeable choice between disappointing its client or giving up its right to enforce the non-compete agreement. In connection with this incident and others, KPMG argues for a very broad reading of the provision of the Settlement Agreement that the respondents shall not, directly or indirectly, "solicit ... work" of any covered client. KPMG argues that the fact that D & B made the first contact in this case is not dispositive of the issue because AnswerThink undoubtedly responded to D & B's first contact by making a presentation and pursuing the business opportunity, thus, "soliciting" the business.

Respondents dispute that their conduct violated the Settlement Agreement. As the letter from D & B shows, D & B initiated the contact with AnswerThink. Thus, Respondents argue, they did not "solicit ... work" from D & B because, at least on the facts presented in this instance, the first contact controls and subsequent responses by Respondents are not "solicitations." Further, they argue it was completely appropriate

under the Settlement Agreement for D & B (rather than AnswerThink or one of the Respondents) to seek KPMG's permission to enter into the relationship. KPMG conceded this latter point at oral argument.

Respondents cite to cases in which courts have held that it does not violate the "no solicitation" language of a covenant not to compete to do business with clients who *initiate* the contact. *See J.E. Hanger, Inc. v. Scussel,* 937 F.Supp. 1546, 1554 (M.D.Ala. 1996); *Aetna Bldg. Maintenance Co. v. West,* 39 Cal.2d 198, 246 P.2d 11 (1952). *See generally,* Annotation, 28 ALR 3d. 7, 34 (1969) (stating that it "has generally been held that a former employee [subject to a non-compete] should not be restrained from receiving unsolicited business from the customers of his former employer, even though the circumstances may be such that he should be prohibited from soliciting such business").

There are circumstances in which it may be hard to determine whether a client's invitation to perform services is "solicited" or "unsolicited." For example, what may appear to be an unsolicited invitation may be the product of a course of action or publicity designed to elicit such an invitation. Annotation, 28 ALR 3d 7, § 6, at pp. 34–37. Here, the evidence is that the initial contact came from D & B and there is no evidence to suggest that this contact was itself the product of some other, earlier contact by Respondents with D & B. In the circumstances, I conclude that the better view is that the Respondents did not "solicit ... work" from D & B, notwithstanding the fact that they responded to D & B's invitation. This conclusion is particularly appropriate here, where Respondents were, in any case, prevented from performing the work D & B sought to hire them to do without KPMG's prior consent.

### 3. *Crown, Cork & Seal*

■ The third incident addressed in KPMG's "Supplemental Motion to Enforce Settlement Agreement" is admittedly not a violation of the Settlement Agreement, but further illustrates the parties' widely variant interpretations of Respondents' rights and obligations thereunder and, in particular, the

scope of activity covered by the proscription that Respondents not "solicit ... work" from clients covered by the non-compete.

KPMG alleges that Crown, Cork & Seal ("CC & S") is a "client of KPMG's Radnor [Pennsylvania] office." KPMG further alleges that Respondent Kelly called the Chief Information Officer of CC & S, Mr. Julian, to invite him to attend a conference in Chicago. Mr. Julian declined. Nothing is alleged by KPMG about the nature of the conference or any direct solicitation of work from CC & S. Nevertheless, KPMG's motion suggests that this information "constitutes another piece of the emerging mosaic of Respondents' systematic disregard for the Settlement Agreement."

Respondents submit the affidavit of Mr. Kelly in which he states that he telephoned Mr. Julian and left a voice-mail inviting him to a Continuous Improvement Center ("CIC") workshop in Chicago. CIC is an entity affiliated with AnswerThink. Kelly later sent Julian a copy of the proposed agenda for the workshop. Julian responded that he was unable to attend. According to Mr. Kelly's affidavit, "approximately thirty (30) representatives of various corporations, of similar size and complexity, attend the workshop, to exchange information concerning how they do business, and what current information technologies are available in the market place." Mr. Kelly states that he did not solicit business from CC & S at any time.

The issue presented by this situation is how broadly this Court will read the Settlement Agreement's prohibition against the "indirect" solicitation of work. I decline to read it so broadly as to prohibit all professional or social contact between Respondents and KPMG clients, although such contact may have as its ultimate goal the establishment of a working relationship. There are several reasons for this. First, the proscriptions in the Settlement Agreement, unless extended by this Court, last only until December 31, 1998. After that date, Respondents and AnswerThink will be free to solicit and accept work from KPMG clients. Thus, Respondents have a legitimate and protectable interest in their efforts to establish or maintain relations with potential clients, even

those covered by the Settlement Agreement. Second, the prohibition against performing work for covered clients during the term of the Settlement Agreement without KPMG's prior written consent makes this case different from the situation where only "solicitation" is prohibited. Where, for instance, a former employee is free to perform "unsolicited" work for customers of his or her former employer, courts are justifiably suspicious of contacts which, while not "solicitations" in form, result in invitations to perform services. *See* Annotation, 28 ALR 3d. 7, §§ 30, 45 (1969) (stating employee may be restrained from receiving future business from customers wrongfully solicited if warranted under factual circumstances). Respondents are not free to perform the work even if the invitation to work is "unsolicited." Thus, there is little incentive for Respondents to engage in efforts to solicit invitations to perform work, and less reason to constrain Respondents from engaging in activities which, although not solicitations, may result in invitations to perform services.

Finally, there is no evidence that Respondents have acted in bad faith in creating situations where KPMG has been forced to make the Hobson's choice between consenting to work otherwise prohibited by the Settlement Agreement and disappointing a client which, for its own reasons, wishes to hire AnswerThink. The only situation of this sort before the Court is the D & B incident, which the evidence shows was not solicited by Respondents. As the D & B situation illustrates, the procedure for seeking approval from KPMG carries risks to both AnswerThink and KPMG. It would be surprising if AnswerThink or Respondents found much advantage in pursuing business opportunities which depended on the prior written approval of KPMG.

#### 4. *Visa International*

AnswerThink and Respondents solicited work from Visa International knowing that it was a client of KPMG. AnswerThink broke off its solicitation efforts after KPMG objected to the solicitation and provided to AnswerThink's counsel evidence showing that substantial work had been performed

for these clients by offices of KPMG (in particular the Houston office) in which one or more of Respondents had worked during the three year period prior to the termination date. There is also evidence that small amounts of work were performed for Visa International at several other relevant offices during the pertinent period. The record does not reflect whether any of the Respondents personally performed services for Visa or maintained a professional relationship with anyone at Visa.

Respondents argue they believed that Visa was, for the purposes of the Settlement Agreement, a client of the San Francisco office of KPMG. Since no AnswerThink employee resigned from KPMG's San Francisco office or an office within 75 miles thereof, Respondents assert they were entitled to solicit Visa's business. The fact that "minor" projects may have been performed for Visa out of other KPMG offices is, Respondents argue, irrelevant.

KPMG points out that the language of the Settlement Agreement does not easily support this interpretation. Instead, the language of the Settlement Agreement, literally construed, more easily supports the conclusion that the obligation not to compete extends to any clients for whom any work was performed by any person in any relevant office during the three year period prior to the termination date. Nothing in the Settlement Agreement, read literally, centers the work for a national client in a single, focal office. Further, nothing in the Settlement Agreement literally permits Respondents to disregard "minor" projects performed in offices other than that focal office.

There are problems with KPMG's proposed literal enforcement of the Settlement Agreement. Most importantly, Respondents lack information needed for them accurately to assess whether some or, perhaps, a broad range of proposed conduct is prohibited. They do not have, and KPMG resists giving them, detailed records showing the work done for KPMG's clients in the relevant offices during the three year period in question. Thus, they are forced either to inquire of KPMG whenever they propose to make a business proposal or to rely on their collective memories to assess compliance. The first alternative raises significant free competition concerns. The second is unreliable.

A literal enforcement of the Settlement Agreement also raises issues about the reasonableness of the resulting restraint against competition. Literally applied, the language of the Settlement Agreement and the partnership agreement would apparently prevent Respondents and AnswerThink from competing for a broad range of business from KPMG clients with whom Respondents had no established ties at all. Delaware law supports the entry of injunctive relief to prevent Respondents from competing for the business of those partnership clients with whom the withdrawing partners had developed economically valuable relationships.[1] *See Research & Trading Corp.* at 12–13 (stating this court has "repeatedly enjoined former employees from dealing with the customers of their former employers with whom the employee had contact"). There is less reason to prevent competition for the business of other KPMG clients who have established relationships with other KPMG partners. I am not prepared to conclude, on this record, that such extra breadth or reach is necessary to protect the legitimate interests of KPMG or ought to be supported by the injunctive powers of this court.

---

1. I assume (without deciding) that it is permitted and compatible with public policy for a partnership of accounting professionals to enter into an agreement restricting the right of its professional members to practice their profession after their withdrawal from the partnership. In the legal profession restricting the right of partners to practice after leaving a firm is against public policy as it limits their professional autonomy as well as the freedom of clients to choose a lawyer. For instance, the Delaware Lawyers' Rules of Professional Conduct Rule 5.6 provides as follows:

A lawyer shall not participate in offering or making:
(a) a partnership or employment agreement that restricts the rights of a lawyer to practice after termination of the relationship, except an agreement concerning benefits upon retirement; or
(b) an agreement in which a restriction in the lawyer's right to practice is part of the settlement of a controversy between private parties.
Delaware Lawyers' Rules of Professional Conduct Rule 5.6.

### 5. *First Union*

First Union Corporation ("First Union") is a client of KPMG. On October 10, 1997, Respondents and AnswerThink solicited work from First Union Insurance Group ("Insurance Group"), a related entity. On October 20, 1997, counsel for Respondents wrote to KPMG's counsel to complain that KPMG partners "have disparaged and libeled [Respondents'] good name and reputation" to representatives of Insurance Group, evidently by stating, among other things, that the terms of the Settlement Agreement prevented Respondents from soliciting business from First Union or Insurance Group. On October 23, 1997, KPMG's counsel replied, advising Respondents' counsel that KPMG considered Insurance Group to be part of the same "organization" as First Union and that services had been performed for First Union by KPMG offices (Atlanta, Chicago, and Radnor) affected by the Settlement Agreement within the last three years, thus triggering the geographical restriction of the non-compete. Respondents' counsel asked for more detailed information, which request was met by the filing of KPMG's supplemental motion to enforce the Settlement Agreement. Respondents thereafter abandoned their solicitation of work from Insurance Group.

In support of its motion, KPMG filed the affidavit of Jerry Licari, a partner in its Charlotte, North Carolina office and the Lead Partner for KPMG in the First Union client relationship. Mr. Licari's affidavit relates the following: (i) KPMG has been doing work for First Union since 1969; (ii) KPMG has, during the relevant time, provided services (unspecified in amount or nature) to both First Union and Insurance Group from several offices to which Respondents were assigned (Atlanta, Chicago and Radnor); (iii) First Union is a holding company having both banking and non-banking subsidiaries, Insurance Group being a division of one of First Union's subsidiaries; (iv) First Union is "a highly integrated and centralized family of companies;" which KPMG has historically treated as a single client and (v) "projects of significance" (including the project which is the subject of Respondents' attempted com-

petition) typically are approved by the President of the holding company. Mr. Licari does not aver that any of the Respondents personally performed services for First Union or Insurance Group or that any of them developed or maintained a professional relationship with any person at either First Union or Insurance Group.

Respondents make two arguments that their efforts to solicit work from Insurance Group did not violate the Settlement Agreement. First, Respondents contend, as they did with regard to Visa, that First Union is for these purposes a client of the Charlotte, North Carolina office of KPMG. As a result, they argue, any work done outside of Charlotte in any office in which Respondents worked or within 75 miles thereof was "incidental to KPMG's major servicing of First Union's needs from Charlotte." Second, Respondents argue that First Union and Insurance Group are not part of a single "organization" for purposes of the applicable provisions of the Settlement Agreement.

The first of these issues was addressed in relation to Visa and is subject to the same analysis. For the reasons already discussed, the record does not support the conclusion that KPMG has a legitimate interest in applying the non-compete provision of the Settlement Agreement to Respondents' solicitation of business from Insurance Group. The record does not reflect whether any of the Respondents ever provided services to First Union or Insurance Group or whether any of them has an established professional relationship with either entity. The record also does not disclose whether the services performed in either Atlanta, Chicago or Radnor were more than incidental to the services provided in the Charlotte office. Thus, only the literal language of the partnership agreement itself supports KPMG's efforts to prevent Respondents from competing for Insurance Group's business. I am unpersuaded that the literal language, by itself, is enough to give KPMG a legitimate, recognizable interest in being free from such competition.

The second argument raises the question whether Insurance Group operates sufficiently autonomously that it may be regarded as a separate "organization" for the purposes of

the non-compete agreement. Certainly, it is possible to conceive of business entities under common ownership which are, in fact, managed and operated as separate organizations. In those hypothetical circumstances, a pre-existing client relationship with one related entity would not necessarily support the enforcement of a non-compete against soliciting business from another. Here, however, the record clearly supports the conclusion that, for purposes of the Settlement Agreement, Insurance Group is part of the First Union "organization." Thus, Respondents' second argument must fail.

## IV. CONCLUSION

For all of the foregoing reasons, Plaintiff's motion and supplemental motion to enforce the Settlement Agreement are denied. Furthermore, I conclude that the record falls short of showing such a pattern of improper or questionable conduct on the part of Respondents sufficient to justify the intrusion of discovery into AnswerThink's or Respondents' business activities. Three of the five incidents cited by KPMG clearly did not involve violations of the Settlement Agreement. The other two (Visa and First Union) involve situations in which the language of the Settlement Agreement requires construction and limitation in order to prevent it from imposing unreasonable restrictions on the competitive activities of Respondents. In the circumstances, the record does not support a reasonable belief that the Respondents have acted in bad faith in their efforts to compete. Thus, I will deny KPMG's request for leave to conduct discovery. Necessarily, I also deny KPMG's request that the terms of the Settlement Agreement be extended for an additional period of six months. **IT IS SO ORDERED.**