# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

FP UC HOLDINGS, LLC,　　　　　　)
FPMCM, LLC, and　　　　　　　　　)
FAST PACE MEDICAL CLINIC,　　　　)
PLLC,　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　 )
　　　　　　　　　Plaintiffs,　　　 )
　　　　　　　　　　　　　　　　 )
　　　　　v.　　　　　　　　　　　)　　**C.A. No. 2019-1029-JRS**
　　　　　　　　　　　　　　　　 )
JAMES W. HAMILTON, JR. and　　　　)
LYNN ASHLEY HAMILTON,　　　　　)
　　　　　　　　　　　　　　　　 )
　　　　　　　　　Defendants.　　　 )

# MEMORANDUM OPINION

Date Submitted: March 11, 2020
Date Decided: March 27, 2020

Gregory B. Williams, Esquire and E. Chaney Hall, Esquire of Fox Rothschild LLP, Wilmington, Delaware and Jeffrey J. Bushofsky, Esquire and Timothy R. Farrell, Esquire of Ropes & Gray LLP, Chicago, Illinois, Attorneys for Plaintiffs.

Travis S. Hunter, Esquire and Tyler E. Cragg, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware and Grant A. Wright, Esquire and Max D. Wright, Esquire of Wright Law, P.C., Tuscumbia, Alabama, Attorneys for Defendants.

**SLIGHTS, Vice Chancellor**

This dispute arises out of a former employee's alleged breaches of non-competition, non-solicitation and confidentiality covenants in an Employment Agreement, a Unit Grant Agreement and a Limited Liability Company Agreement. Each of the agreements impose varying degrees of restrictions upon Defendants' post-employment activities. Plaintiffs, the former employers, allege that Defendants, a former employee and his spouse, breached the agreements when the husband left Plaintiffs' urgent medical care business in Tennessee to start, with his wife, a competing urgent medical care business in Alabama.[1] Plaintiffs have brought a Motion for Preliminary Injunction (the "Motion") in which they seek to shutter Defendants' competing business pending a trial on the merits.[2]

To obtain the relief they seek, Plaintiffs must demonstrate that, at a minimum, they will likely succeed at trial. They have not carried this burden. Under Delaware law, which is the parties' contractual choice of law, the restrictive covenants are too broad as they would essentially prevent Defendants from operating their urgent care clinic anywhere in the United States. Under Alabama law, arguably applicable as the law of the state with the most substantial relationship to this dispute, the restrictive covenants are unenforceable as a matter of Alabama's legislatively

---

[1] Verified Am. Compl. for Inj. Relief & Damages ("Compl.") (D.I. 24). As explained below, the spouse is contractually bound to Plaintiffs even though she was not employed by them.

[2] Pls.' Mot. for Prelim. Inj. (D.I. 62).

1

expressed public policy. Either way, since the covenants are likely unenforceable, Plaintiffs cannot demonstrate a likelihood of success on the merits. The Motion, therefore, in large part, must be denied.[3]

Plaintiffs also seek an anti-suit injunction that would specifically enforce the parties' contractual choice of a Delaware forum and prevent Defendants from prosecuting their first-filed related action in the Circuit Court of Lauderdale County, Alabama (the "Alabama court"). For reasons unclear, Plaintiffs chose not to seek this relief before engaging with Defendants in Alabama. Instead, they elected to litigate a motion for summary judgment in Alabama, which has now been decided by the Alabama court. The anti-suit injunction Plaintiffs would have me enter would bar Defendants (the Alabama plaintiffs) from appealing those aspects of the summary judgment decision that Defendants lost. It would also bar Defendants from further prosecuting at least some of their claims that survived summary judgment.

Plaintiffs' call to equity comes too late. This Court will not involve itself, even indirectly, in the Alabama action after Plaintiffs have availed themselves of that state's jurisdiction and have drawn her courts into this dispute.

---

[3] As explained below, Plaintiffs have demonstrated they are entitled to preliminary injunctive relief with respect to the restrictive covenants governing Defendants' use of Plaintiffs' confidential information.

# I. BACKGROUND

For purposes of the Motion, I draw the facts from the pleadings, the affidavits and the exhibits (including depositions) submitted to the Court in connection with the Motion.[4]

## A. The Parties

Plaintiffs, FP UC Holdings, LLC ("Holdings"), FPMCM, LLC ("FPMCM") and Fast Pace Medical Clinic, PLLC ("Clinic" and, collectively with Holdings and FPMCM, "Fast Pace" or the "Company"), are affiliated entities that run more than 100 urgent care clinics across the southeast United States. Defendants, James W. Hamilton, Jr. and Lynn Ashley Hamilton, are a married couple residing in Florence, Alabama. Lynn Hamilton is relevant to these proceedings largely because she became a party to the Grant and LLC Agreements (which are defined below) when she executed spousal consents.

Mr. Hamilton is a Certified Nurse Practitioner who, until 2019, was a Fast Pace employee working in a clinic in southern Tennessee. The parties dispute the nature of Mr. Hamilton's role at Fast Pace. As Director of Education and Development, Fast Pace alleges Mr. Hamilton was a high-ranking employee tasked with setting strategy and training employees across multiple locations.

---

[4] *Plaze, Inc. v. Callas*, 2019 WL 1028110, at *1 (Del. Ch. Feb. 28, 2019).

Mr. Hamilton counters that Fast Pace overstates his responsibilities; he insists that he was, at best, mid-level management. An organizational chart from November 2017 shows Mr. Hamilton reporting to Fast Pace's Chief Clinical Officer who, in turn, reports to the CMO who, in turn, reports to the CEO.[5] The chart shows only one employee reporting directly to Mr. Hamilton.[6]

## B. The Relevant Contracts

Mr. Hamilton entered into an Employment Contract with Clinic dated April 20, 2012 (the "Employment Agreement").[7] In that agreement, Mr. Hamilton agreed to refrain from "engag[ing] in the management or operation of an urgent care/walk-in clinic business for a period of two years within 60 miles of any significant place of business of the [Clinic]."[8] Unlike the other agreements relevant to this dispute, the Employment Agreement made no mention of choice of forum or choice of law. Accordingly, the Hamiltons asked the Alabama court to decide whether the Employment Agreement's restrictive covenants were enforceable. In a

---

[5] Transmittal Aff. of Tyler E. Cragg, Esq., in Supp. of Defs.' Answering Br. in Opp'n to Pls.' Mot. for Prelim. Inj. (D.I. 73) ("Cragg. Aff.") Ex. 54 at FP0086758 (the "Org. Chart"), FP0086755 (identifying Fast Pace's "management team," which did *not* include Mr. Hamilton).

[6] Org. Chart.

[7] Transmittal Aff. of E. Chaney Hall, Esq. to Pls.' Opening Br. in Supp. of their Mot. for Prelim. Inj. ("Chaney Aff.") (D.I. 64–67) Ex. 9 (the "Employment Agreement").

[8] Employment Agreement § 2.

well-reasoned decision, the Alabama court determined that they were not.[9]  Because claims and defenses under the Employment Agreement have already been adjudicated, the Motion focuses on the Grant Agreement and LLC Agreement.

In 2016, Fast Pace's ownership structure changed when a private equity firm acquired the Company.  At that time, certain Fast Pace employees, including Mr. Hamilton, were offered Holdings membership units in exchange for an agreement to be bound by broader restrictive covenants.  The value of Mr. Hamilton's membership units (and, thus, the consideration he received in exchange for his ratcheted-up obligations) is unclear.  In answers to interrogatories, Fast Pace declined to place a value on Mr. Hamilton's membership units.[10]

When he received his Holdings membership units, Mr. Hamilton signed two Class P-1 Unit Grant Agreements, both dated December 5, 2016 (collectively, the "Grant Agreement").[11]  The Grant Agreement included an annex that bound Mr. and

---

[9] Chaney Aff. Ex. 35 (the "Alabama Order") ¶¶ 2, 3.

[10] Chaney Aff. Ex. 42 at 11–12 (Interrogatory No. 7).

[11] Pls.' Opening Br. in Supp. of Mot. for Prelim. Inj. ("POB") (D.I. 64) Ex. 5 & 6 (the "Grant Agreement").  The Grant Agreement incorporates the LLC Agreement's choice of law and forum selection provisions, selecting Delaware's law and courts, respectively.  Grant Agreement § 1(a).

5

Mrs. Hamilton to both the Grant Agreement and Holdings' Second Amended and Restated Limited Liability Company Agreement (the "LLC Agreement").[12]

### 1. The Grant Agreement

The Grant Agreement contains three restrictive covenants relevant to the Motion. *First*, unlike the non-compete in the Employment Agreement, which prohibits Mr. Hamilton from engaging in the management or operation of an urgent care clinic within 60 miles of a Fast Pace clinic, the Grant Agreement prohibits Mr. Hamilton from being employed by a business that "engages" in the same business as Fast Pace "anywhere in the United States" where Fast Pace operates or "proposes" to operate:

> During the period commencing on [December 5, 2016] and ending on the second [] anniversary of the date that the Grantee ceases to be a Service Provider (the "Restricted Period"), **[the Hamiltons] shall not** . . . **directly or indirectly**, own any interest in, manage, control, **participate in (whether as** an owner, operator, manager, consultant, officer, director, **employee**, investor, agent, representative or otherwise), consult with, **render services for or otherwise engage in any business** or entity **which** directly or indirectly **engages in any business that [Fast Pace] conducts or proposes to conduct** during the Restricted Period **anywhere in the United States** where [Fast Pace] operates or **proposes to operate.**[13]

---

[12] Chaney Aff. Ex. 1 (the "LLC Agreement"); Grant Agreement Annex 1.

[13] Grant Agreement § 7 (emphasis supplied).

The Grant Agreement does not define Fast Pace's "business," either in Section 7 or elsewhere.

*Second* and *third*, the Grant Agreement prohibits post-employment solicitation of Fast Pace employees and disclosure of Fast Pace confidential information:

> During the Restricted Period, the Grantee shall not, and shall not . . . directly or indirectly, (a) induce or attempt to induce any employee or independent contractor of [Fast Pace] to leave the employ or engagement of [Fast Pace] or in any way interfere with the relationship between [Fast Pace] and any if [its] respective employees or independent contractors, (b) hire or otherwise retain any Person who was an employee or independent contractor of [Fast Pace] during the Restricted Period or within the one year prior to [December 5, 2016].[14]
>
> *****
>
> [The Hamiltons] agree[] that, from and after [December 5, 2016], the [Hamiltons] shall . . . treat and hold as confidential and not use all information concerning the business and affairs of [Fast Pace] (the "Confidential Information"), except to the extent that such disclosure or use is for the benefit of [Fast Pace]. . . .[15]

---

[14] Grant Agreement § 8.

[15] Grant Agreement § 9.

## 2. The LLC Agreement

As noted, when Mr. Hamilton received his Holdings membership units, he and his wife agreed to be bound by the LLC Agreement.[16] That agreement, at Section 15, restricts members from pursuing certain business opportunities outside of Fast Pace:

> Each Member . . . shall bring all investment or business opportunities to [Holdings] of which it, he or she becomes aware and which it, he or she believes would qualify as an investment or business opportunity in the Business [(defined as "the business of providing urgent care and primary care services through the development, ownership and operation of clinics and any other business currently conducted (or actively pursued) by [Fast Pace])] (each an "Opportunity").[17]

### C. Mr. Hamilton Leaves Fast Pace and Opens Thrive

On July 9, 2019, Mr. Hamilton notified Fast Pace that he intended to terminate his employment with the Company. Shortly after his departure, Mr. Hamilton signed a commercial lease for office space in Florence, Alabama. In mid-August, Mr. Hamilton incorporated Thrive Urgent Care, Inc. ("Thrive"), an Alabama LLC

---

[16] Like the Grant Agreement, the LLC Agreement contains a Delaware choice of law and forum selection provision. LLC Agreement §§ 19.2 (choice of law), 19.5 (forum selection).

[17] LLC Agreement §§ 1 (definition of "Business"), 15.5. The LLC Agreement contains a non-disclosure covenant similar to the one in the Grant Agreement. LLC Agreement § 9.4.

formed for the stated purpose of operating an urgent care clinic.[18] To finance Thrive, the Hamiltons borrowed $233,000 secured by their home.[19] During the fall of 2019, Mr. Hamilton negotiated agreements with various medical vendors, and, on October 17, 2019, he began advertising Thrive's impending opening.

Thrive opened its doors and started seeing patients on November 20, 2019. Its clinic is located 26 miles south of a Fast Pace clinic in southern Tennessee. Fast Pace alleges Thrive has seen 420 patients since its opening, 35 of whom are Tennessee residents and 6 of whom previously visited a Fast Pace Clinic.[20]

### D. Procedural History

On November 4, 2019, Fast Pace sent Mr. and Mrs. Hamilton a cease and desist letter in which it claimed Mr. Hamilton was in material breach of the Grant Agreement's non-compete covenant, as well as the LLC Agreement's business opportunity restriction.[21] Fast Pace also notified the Hamiltons that it was cancelling Mr. Hamilton's membership units in Holdings, a penalty for his breach allegedly permitted by the Grant Agreement.

---

[18] *See* Chaney Aff. Ex. 36.

[19] Chaney Aff. Ex. 18 at 48–49.

[20] POB at 53.

[21] Chaney Aff. Ex. 27.

In response, on November 14, 2019, Mr. Hamilton sued Holdings, FPMCM and Clinic in Alabama. In his Alabama complaint, Mr. Hamilton sought a declaration that both the Grant and Employment Agreements' non-compete provisions were unenforceable as a matter of Alabama public policy. He also sought damages from Holdings for cancelling his units in breach of the Grant Agreement.

While the Alabama action was pending, Fast Pace filed its first complaint in this Court on December 23, 2019.[22] In the now operative Complaint, Fast Pace brings 10 counts against the Hamiltons—including claims for breaches of the LLC, Grant and Employment Agreements, as well as breach of fiduciary duty and unjust enrichment.[23]

Fast Pace sought a Temporary Restraining Order on the same day it filed its original complaint.[24] On January 3, 2020, I declined to issue the TRO upon finding the relief Fast Pace sought was tantamount to a preliminary injunction, but without the requisite evidentiary support.[25] The proposed TRO focused on the Hamiltons'

---

[22] D.I. 1.

[23] Compl. ¶¶ 103–88.

[24] D.I. 2.

[25] D.I. 14.

violation of the restrictive covenants; importantly, Fast Pace did not seek to enjoin Mr. Hamilton's prosecution of the Alabama action.[26]

About a month after I denied Fast Pace's requested TRO, as noted, the Alabama court granted partial summary judgment in favor of Mr. Hamilton, holding that the Employment Agreement's non-compete was void as a matter of Alabama public policy.[27] In dicta, the Alabama court stated it would have held the non-compete in the Grant Agreement was also void, but it declined to reach that issue out of respect for the Grant Agreement's Delaware forum selection clause.[28] Instead, the Alabama court dismissed Mr. Hamilton's claims against Holdings and FPMCM, except for those arising out of the Employment Agreement.[29] Fast Pace filed the Motion in this Court on February 24, 2020.[30]

## II. ANALYSIS

In the Motion, Fast Pace asks that I enjoin Mr. and Mrs. Hamilton from:

- "owning and operating" Thrive;

- "managing, controlling, or participating in" Thrive or any similar business "anywhere that [Fast Pace] . . . operates or proposes to operate,

---

[26] *See* Proposed TRO (D.I. 4).

[27] Alabama Order ¶ 3.

[28] Alabama Order ¶ 3(g).

[29] Alabama Order ¶¶ 2–3.

[30] D.I. 62.

11

including, but not limited to, Alabama, and within 60 miles" of any Fast Pace location;

- "inducing or attempting to induce" any Fast Pace employee to leave their employment;

- "retaining any Person," including Theresia Roach, who was a Fast Pace employee during the "Restricted Period" or within one year prior to December 5, 2016;

- "using or disclosing" Fast Pace's confidential information; and

- "further prosecuting, appealing any judgment from, or otherwise proceeding" with the Alabama action or otherwise "pursuing" in any forum other than Delaware, any actions arising out of the Grant or LLC Agreements. [31]

To earn a preliminary injunction, a plaintiff must demonstrate: (1) a reasonable probability of success on the merits, (2) that absent preliminary injunctive relief, it faces imminent and irreparable injury and (3) that such harm outweighs the harm that may result from the injunction, should it prove to have been improvidently granted.[32] "The relief afforded by a preliminary injunction is both powerful and extraordinary. As such, it is not granted lightly."[33] The court is even less inclined to grant preliminary injunctive relief when the "relief prayed for, would, in effect,

---

[31] Proposed Order Granting Mot. for Prelim. Inj. ("Proposed Order") (D.I. 64).

[32] *See C & J Energy Servs., Inc. v. City of Miami Gen. Empls.*, 107 A.3d 1049, 1066 (Del. 2014).

[33] *N.K.S. Distribs., Inc. v. Tigani*, 2010 WL 2367669, at *5 (Del. Ch. June 7, 2010). *See also Cantor Fitzgerald, LP v. Cantor*, 724 A.2d 571, 579 (Del. Ch. 1998) (same).

grant [the movant] the maximum injunctive relief it might hope to achieve" after trial.[34]

Mr. and Mrs. Hamilton maintain the Court need not address the Motion's merits because Fast Pace waited too long to invoke equity and is, therefore, guilty of laches.[35] While I appreciate their frustration, the laches analysis is difficult at this stage because the facts related to when Fast Pace became aware that the Hamiltons may have been breaching the restrictive covenants are unclear. Accordingly, I turn directly to the merits of the Motion, with a particular focus on whether Fast Pace has demonstrated a likelihood of success on the merits of its claims.

For the reasons I explain below, Fast Pace has failed to demonstrate a likelihood of success on its claim of breach of the non-compete or non-solicit covenants, breach of the business opportunity restriction or breach of fiduciary duty. Anti-suit injunctive relief is likewise not appropriate here. Fast Pace has, however, adequately supported its request for injunctive relief with respect to the Grant and

---

[34] *Signal Fin. of Del., Inc. v. J.F. Burns*, 1980 WL 268077, at *2 (Del. Ch. Sept. 29, 1980) (noting that movant bore a higher burden to demonstrate likelihood of success when it was seeking all it could hope to achieve at trial). *See also In re Digex Inc. S'holders Litig.*, 789 A.2d 1176, 1215 (Del. Ch. 2000) (same); *Data Gen. Corp. v. Digital Computer Controls, Inc.*, 297 A.2d 437, 439 (Del. 1972) ("[P]reliminary injunctions which allow the plaintiff all the relief he could hope to gain are rarely granted.").

[35] Defs.' Answering Br. in Opp'n to Pls.' Mot. for Prelim. Inj. ("DAB") (D.I. 73) at 21 (citing Chaney Aff. Ex. 42 at 9).

LLC Agreements' restrictive covenant relating to Fast Pace confidential information.

## A. The Grant Agreement's Non-Compete

Fast Pace's claims under the Grant Agreement implicate a threshold choice of law issue. The Grant Agreement contains a Delaware choice of law provision; it is appropriate, therefore, to consider first whether the non-compete is enforceable as a matter of Delaware law. For reasons I explain below, it likely is not. For the sake of completeness, I also consider whether the non-compete is enforceable as a matter of Alabama law, the law that would likely apply but for the parties' contractual choice of Delaware law. Here again, for reasons I explain below, the non-compete is likely not enforceable as a matter of Alabama law either.

### 1. Delaware Law

Delaware courts do not "mechanically" enforce non-competes.[36] Instead, our courts carefully review the covenants to assure they "(1) [are] reasonable in geographic scope and temporal duration, (2) advance a legitimate economic interest of the party seeking its enforcement, and (3) survive a balancing of the equities."[37] When assessing "reasonableness," the court focuses on whether the non-compete is

---

[36] *McCann Surveyors, Inc. v. Evans*, 611 A.2d 1, 3 (Del. Ch. 1987).

[37] *Lyons Ins. Agency, Inc. v. Wilson*, 2018 WL 4677606, at *5 (Del. Ch. Sept. 28, 2018).

"essential for the protection of the employer's economic interests."[38] The court then balances the employer's interests against the employee's interests. Ultimately, "a court of equity will not enforce [a non-compete] if, on balance, to do so would impose an unusual hardship on a former employee."[39] When applying this balancing test, the court should take notice of the consideration an employee received in exchange for her promise not to compete before determining whether the non-compete is reasonable.[40] In addition, the court should pay particular attention to "the temporal and geographic restrictions" within the covenant.[41] If the employer

---

[38] *Norton Petroleum Corp. v. Cameron*, 1998 WL 118198, at *3 (Del. Ch. Mar. 5, 1998).

[39] *Id.*; *McCann*, 611 A.2d at 4 ("The consequences to defendant of specifically enforcing a contract not to compete are always appropriate to consider.").

[40] *See, e.g.*, *O'Leary v. Telecom Res. Serv., LLC*, 2011 WL 379300, at *3 (Del. Super. Ct. Jan. 14, 2011) (reviewing a 4-year non-compete covering the entire United States that was negotiated after the sale of a business for a substantial price); *Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 465 (Del. Ch. 1977) (Non-competes "are subject to somewhat greater scrutiny when contained in an employment contract as opposed to contracts for the sale of a business."); *Kan–Di–Ki, LLC v. Suer*, 2015 WL 4503210, at *20 (Del. Ch. July 22, 2015) (holding, post-trial, that a non-compete restricting competition for five years in twenty-three states was enforceable, in part, because "when [the purchaser] paid $4 million and then roughly $300,000 to acquire [the seller's] interests in two successive businesses, [the purchaser] acted reasonably and legitimately in insisting on some measure of protection from the possibility that [the seller] simply would go out and take those clients or otherwise undermine [the purchaser's] business."); *Tristate Courier and Carriage, Inc. v. Berryman*, 2004 WL 835886, at *1–2, *10, *13 (reviewing a non-compete entered into in connection with a sale of stock for $150,000 and observing, "[b]ecause the Covenant is part of a contract for the sale of stock, this inquiry is less searching than if the Covenant had been contained in an employment agreement.").

[41] *Del. Elevator, Inc. v. Williams*, 2011 WL 1005181, at *8 (Del. Ch. Mar. 16, 2011); *see also Kan–Di–Ki*, 2015 WL 4503210, at *19 n.232 (same).

overreaches by imposing an obviously overbroad geographic restriction on its employee's ability to seek employment after separation, this court will readily decline to enforce the restriction.[42]

Even at first glance, what stands out about the Grant Agreement's non-compete is the breadth of its geographic restriction. The Grant Agreement purports to restrict Mr. and Mrs. Hamilton's ability "directly or indirectly" to own, manage or work in an urgent medical care facility anywhere in the United States where Fast Pace currently operates or proposes to operate.[43] Of course, Face Pace "proposes to conduct business" in every state in the United States.[44] It is not surprising, then, that Mr. Hamilton concedes he is breaching the Grant Agreement's non-compete. How could he not be? Indeed, in light of the Grant Agreement's failure to define precisely what Fast Pace's "business" is, one could argue that Mr. Hamilton would be in

---

[42] *Del. Elevator*, 2011 WL 1005181, at *10–11; *compare All Pro Maids, Inc. v. Layton*, 2004 WL 1878784, at *5 n.23 (Del. Ch. Aug. 9, 2004), *aff'd* 880 A.2d 1047 (Del. 2005) ("Noncompete agreements covering *limited areas* for two of fewer years generally have been held to be reasonable.") (emphasis supplied), *with Norton*, 1998 WL 118198, at *3–4 (declining to enforce a non-compete prohibiting a former-employee from working in a "similar" business within a 100-mile radius).

[43] Grant Agreement § 7.

[44] Chaney Aff. Ex. 3 at 60–62 ("So there is a possibility that Fast Pace may have clinics in the next three or four years in every state in the United States? A. Yes. Q. And that's the goal? A. Yes."), Ex. 25 at 34 ("Q. And we heard testimony yesterday from Dana that y'all have plans to open clinics in every state in the country? A. I think that's—I would say, sure, over the next several years we have plans to continue to open up. Is it going to be in every state? I don't know that. Q. That's a possibility? A. Anything is possible.").

breach of the non-compete if he were employed as a nurse anywhere in the country.[45] Given the vast geographic scope of the non-compete, Fast Pace must demonstrate it is protecting a particularly strong economic interest to persuade the Court that the non-compete is enforceable.

To meet its burden, Fast Pace points to this court's 2018 decision in *Lyons Insurance v. Wilson*.[46] That case is inapposite. There, the court held that even though a contractual prohibition of "competition with" an employer's business was not limited geographically, the nature of the employer's business was such that a more reasonable geographic limitation was "inherently establish[ed]."[47] There is no such inherent limitation embedded in the Grant Agreement; Fast Pace's stated intent to operate everywhere in the United States eviscerates any implied geographic limitation that might otherwise be drawn from the Grant Agreement's non-compete language.[48]

To be sure, this court has enforced non-competes with a nationwide scope, but only in instances where the competing party agrees, in connection with the sale of a business, to stand down from competing in the relevant industry . . . anywhere . . . for

---

[45] Chaney Aff. Ex. 3 at 60–62, Ex. 25 at 34.

[46] POB at 49–50 (citing *Lyons Ins.*, 2018 WL 4677606, at *5–6).

[47] *Lyons Ins.*, 2018 WL 4677606, at *5.

[48] Chaney Aff. Ex. 3 at 60–62, Ex. 25 at 34.

a stated period of time after the sale.[49]  These broader restrictions make sense following the sale of a business.  The buyer has just paid handsomely for the business and the broad non-compete clears the seller from the competitive space while the buyer strives to make the business he just bought successful.  Unlike cases involving the enforcement of non-competes following the sale of a business, the record here lacks any evidence that Mr. Hamilton received substantial consideration in exchange for his commitment not to work in Fast Pace's industry anywhere in the United States.   This raises the concern that Fast Pace significantly ratcheted up Mr. Hamilton's non-compete restrictions in exchange for token consideration.[50]  Fast Pace's policy of requiring *all employees* to sign restrictive covenants heightens this concern.[51]

Apparently recognizing the nearly boundless net cast by the Grant Agreement's non-compete, Fast Pace now allows that its non-compete expectations actually trace the Employment Agreement's less onerous 60-mile range, restricting

---

[49] *See, e.g.*, *O'Leary*, 2011 WL 379300, at *3–5 (upholding nationwide non-compete given in exchange for substantial consideration paid in connection with the sale of a business that operated throughout the country); *Kan–Di–Ki*, 2015 WL 4503210, at *19 (holding a non-compete that "include[ed] the twenty-three states west of the Mississippi River" was enforceable because they were "executed as a part of the sale of a business as a going concern").

[50] Chaney Aff. Ex. 42 at 11–12 (Interrogatory No. 7).

[51] Chaney Aff. Ex. 42 at 10–11 (Interrogatory No. 5).

Mr. Hamilton from owning or operating a competing business only within that range, and permitting him to work in other fields of nursing.[52] As best I can discern, this is tantamount to a request that I "blue pencil" the Grant Agreement to match the non-compete in the Employment Agreement. In this regard, I note that at least one court has viewed a similar effort by an employer to narrow the reach of its non-compete *post hoc* to be an implicit concession that the relevant non-compete is facially overbroad.[53]

While, in some circumstances, a court may use its discretion to blue pencil an overly broad non-compete to make its restrictions more reasonable,[54] this court has also exercised its discretion in equity not to allow an employer to "back away from an overly broad covenant by proposing to enforce it to a lesser extent than written."[55] Whether I should blue pencil the Grant Agreement's non-compete is a fact-intensive

---

[52] PRB at 1; Proposed Order ¶ 2.

[53] *See Del. Elevator*, 2011 WL 1005181, at *9 ("On the facts of this case, this combination of provisions is facially overbroad. Delaware Elevator conceded as much in its complaint by seeking only to enforce its provisions in a 100-mile radius around the Newark, Delaware office.").

[54] *See, e.g.*, *Knowles-Zeswitz Music, Inc. v. Cara*, 260 A.2d 171, 175 (Del. Ch. 1969).

[55] *Del. Elevator*, 2011 WL 1005181, at *10; Griffin Toronjo Pivateau, *Putting the Blue Pencil Down: An Argument for Specificity in Noncompete Agreements*, 86 NEB. L. REV. 672, 689–93 (2008) (arguing courts' willingness to modify non-competes creates confusion and encourages employers to overreach).

question that I am not able to resolve on this record.[56] For example, as has been noted, it is unclear what value Mr. Hamilton received in exchange for his stepped-up non-compete. This uncertainty fairly implicates the Court's concern about employer overreach—placing Fast Pace's reasonable probability of success in doubt. On this record, I am satisfied the Grant Agreement's non-compete is likely overbroad as a matter of Delaware law, and I have serious doubts that the Court would be inclined to rewrite the clause to make it more reasonable as a matter of equity.

## 2. Alabama Law

Title 8, Chapter 1, Section 190 of the Code of Alabama provides, "Every contract by which anyone is restrained from exercising a lawful profession, trade, or business of any kind otherwise than is provided . . . is . . . void."[57] The Hamiltons argue this statutory policy prevents Fast Pace from enforcing the Grant Agreement's non-compete within Alabama's borders.[58] Thus, they argue, even if the non-compete were enforceable under Delaware law (which is doubtful), Fast Pace must still convince the Court that it should apply Delaware law given Alabama's

---

[56] *See, e.g.*, *Norton*, 1998 WL 118198, at *3 (reducing a non-compete's geographic scope post-trial from 100 miles to 20 miles based on "a form and scope consistent with the equities established by the factual record.").

[57] *Ala. Code* § 8-1-190.

[58] DAB at 28–30.

significant relationship to this dispute and its strong public policy disfavoring the enforcement of non-competes.

In determining which state's law applies to a contract, Delaware generally follows the Restatement (Second) of Conflict of Laws.[59]  Relevant here are two provisions of the Restatement—Sections 187 and 188.[60]  Reduced to its essence, and keyed to Section 190, the choice of law analysis in circumstances where the parties have contracted for choice of law involves three questions: (1) whether "absent the contractual agreement of the parties to import Delaware law, [Alabama] law would apply[,]" (2) "whether the enforcement of the covenant would conflict with a 'fundamental policy' of [Alabama's] law" and (3) "whether [Alabama] has a materially greater interest in the issues—enforcement (or not) of the contract at hand—than Delaware."[61]  If these narrow "questions are answered in the affirmative, [Alabama] law will apply notwithstanding the choice-of-law provision."[62]

The first question under Section 187—what state's law would apply *but for* the Delaware choice-of-law provision—is governed by Section 188 of the

---

[59] *Ascension Ins. Hldgs., LLC v. Underwood*, 2015 WL 356002, at *2 (Del. Ch. Jan. 18, 2015).

[60] RESTATEMENT (SECOND) CONFLICT OF LAWS ("RESTATEMENT") §§ 187–88 (2019).

[61] *Ascension*, 2015 WL 356002, at *6–8.

[62] *Id*.

Restatement.[63]  That Section provides, in relevant part, that "an issue in contract [is] determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties."[64]  The factors a court *may* consider in determining which state has the most significant relationship to the transaction and the parties include: (1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of performance, (4) the location of the subject matter of the contract and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties.[65]  Many of these factors, such as the place of performance, subject matter of the contract (Mr. Hamilton's competitive activities), and domicile of the parties point to Alabama law.

In addition, when engaging in the most significant relationship analysis, our courts also consider the factors laid out in Section 6 of the Restatement, which are: (1) the needs of the interstate and international systems, (2) the relevant policies of the forum, (3) the relevant policies of other interested states and the relative interest of those states in the determination of the particular issue, (4) the protection of justified expectations, (5) the basic policies underlying the particular field of law, (6) certainty, predictability and uniformity of result and (7) ease in the determination

---

[63] *Id.*, at *2 n.8 (quoting RESTATEMENT § 187).

[64] RESTATEMENT § 188(2).

[65] *Id.*

and application of the law to be applied.[66]  Under these principles, Alabama's strong public policy, as expressed in *Ala. Code* § 8-1-190, also points to the application of Alabama law.

The comments to Section 188 further elaborate, "the state where performance is to occur has an *obvious interest* in the question whether this performance would be illegal."[67]  Here, Fast Pace is effectively asking Mr. Hamilton to "perform" the non-compete in Alabama.  While "place of performance can bear little weight in the choice of applicable law when [] at the time of contracting it is either uncertain or unknown," the Grant Agreement's plain language makes clear that the parties anticipated Mr. Hamilton would "perform" in every state within the United States where Fast Pace *operates* or *proposes to* operate, including Alabama.[68]  And  Mr. Hamilton's Alabama domicile at the time of contracting further supports an inference that the parties anticipated his performance (i.e., non-competition)

---

[66] *Id.* §§ 6, 188; *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 41 (Del. 1991).

[67] RESTATEMENT § 188 (Comment e) (emphasis supplied).

[68] *Id.*; Grant Agreement § 7; *see also* Chaney Aff. Ex. 3 at 60–62, Ex. 25 at 34 (Fast Pace executives predict the Company will operate in every state within four years.).

23

might well occur in that state—meaning his performance was not divided "equally" among multiple states.[69]

Even though Holdings is a Delaware corporation with its principal place of business in Tennessee, and Mr. Hamilton worked for Fast Pace in Tennessee, Alabama's legislature has specifically addressed the *particular issue* of enforcing restrictive covenants within its borders.[70] Comment C to Section § 188 directs courts to consider the "interest of a state in having its contract rule applied in the determination of a *particular issue*," as well as "the purpose sought to be achieved by that rule."[71] Here, the relevant purpose is to protect Alabama citizens' interest "in being able to receive [professional] services."[72]

Under these circumstances, following the guidance provided by both Section 188 and Section 6 of the Restatement, it is difficult to see how I would conclude after trial that Delaware or Tennessee, as opposed to Alabama, has the most

---

[69] RESTATEMENT § 188 (Comment e) ("[T]he place of performance can bear little weight in the choice of the applicable law when . . . performance by a party is to be divided more or less equally among two or more states.").

[70] *See Ala. Code* § 8-1-190; POB at 38–39.

[71] RESTATEMENT § 188 (Comment c) (emphasis supplied).

[72] *Benchmark Med. Hldgs., Inc. v. Barnes*, 328 F. Supp. 2d 1236, 1253 (M.D. Ala. 2004) (refusing to apply Pennsylvania law to a Purchase Agreement that selected Pennsylvania law because "Alabama courts . . . will not apply another state's law if the covenant not to compete is void under Alabama law").

significant relationship to the *particular issue* in dispute here—that is, whether the Grant Agreement's non-compete is enforceable in Alabama. All of this is to say that the answer to the first question under Section 187's choice-of-law analysis—whether Alabama law would apply absent the Delaware choice-of-law provisions—is probably yes.

As for the second question under the Section 187 analysis—whether the enforcement of the covenant would conflict with a "fundamental policy" of Alabama—it is well-settled Alabama law "frowns on restrictive covenants."[73] That the Alabama Court has already stated it would void the Grant Agreement's non-compete is powerful evidence to that effect.[74] The plain language of *Ala. Code* § 8-1-190(a) voids "every contract by which anyone is restrained from exercising a lawful profession."[75] And, while the Alabama statute provides exceptions for an

---

[73] *McGriff Seibels & Williams, Inc. v. Sparks*, 2019 WL 4600051, at *13 (N.D. Ala. Sept. 23, 2019) (applying *Ala. Code* § 8-1-190).

[74] Alabama Order ¶ 2. While not entirely clear, it appears Fast Pace may be arguing the Grant Agreement's non-compete *is enforceable* under Alabama law. *See* POB at 46. If so, Fast Pace must overcome the inconvenient reality that it litigated, and lost, this issue before the Alabama court, which held unequivocally the Employment Agreement's non-compete violated Alabama law, and noted in *dicta* that it would have held the more restrictive non-compete in the Grant Agreement was likewise unenforceable *but for* the Grant Agreement's Delaware forum selection provision. Alabama Order ¶ 2(g). Thus, for Fast Pace to succeed on this argument, it must convince this Court the Alabama court got its own law wrong. Even if I were inclined to second-guess the Alabama court (a dubious exercise), Fast Pace has offered no good reason to suggest Alabama law is not as the Alabama court found it.

[75] *Ala. Code* § 8-1-190.

"employee of a commercial entity" to agree "to refrain from carrying on or engaging in a similar business,"[76] Alabama courts have held the exception "do[es] not apply to professionals."[77]

I also note that courts applying Alabama law have declined to give effect to non-competes in similar circumstances despite contractual choice of law provisions adopting the law of another state.[78] For example, in *Benchmark*, a buyer of a physical therapy practice sued its former-owner who allegedly breached a non-compete in a purchase agreement.[79] While the court held the non-compete was *enforceable* to the extent the physical therapist was "simply managing the business of other physical therapists," it held the non-compete was *unenforceable* to the extent it prohibited the physical therapist from being a "manager or executive in a physical therapy facility where he [also] does hands-on physical therapy."[80] In other words, the non-compete could not prevent the physical therapist from doing "the

---

[76] *Ala. Code* § 8-1-190(b)(4).

[77] *Benchmark*, 328 F. Supp. 2d at 1243 (citation omitted).

[78] *Id.* at 1242 (declining to give effect to a Pennsylvania choice of law provision in a Purchase Agreement and holding that a covenant not to compete was partially unenforceable as applied to a physical therapist).

[79] *Id.* at 1243.

[80] *Id.* at 1256.

necessary things involved in operating a practice" even if done "in association with others."[81]

After reviewing Alabama law, I am satisfied the answer to Section 187's second question is likely yes. Alabama public policy would be offended if I were to enforce the non-compete to shut down an urgent medical care facility within Alabama's borders.

Having answered the first two questions posed by *Ascension* (and Restatement Section 187) affirmatively, I turn to whether Alabama's interest against the enforcement of non-competes materially outweighs Delaware's general interest in freedom of contract.[82] As I have noted above, Alabama's legislature specifically addressed the enforceability of non-competes when applied to professionals, and it acted to protect its citizens' ability to access professional services.[83] Under similar circumstances, Vice Chancellor Glasscock compared California's clear prohibition of non-competes on "fundamental policy grounds" with Delaware's compelling "[but] general interest in the sanctity of contract," and held that California's public

---

[81] *Id.* at 1255–56.

[82] *See Ascension*, 2015 WL 356002, at *4–5.

[83] *Ala. Code* § 8-1-109; *Benchmark*, 328 F. Supp. 2d at 1252 (citing *Anniston Urologic Assoc., P.C. v. Kline*, 689 So.2d 54, 60 (Ala. 1997)) ("Restrictions that tend to deny the public in the affected area access to a trained professional have repeatedly been struck down by the courts as unenforceable on public policy grounds.").

policy outweighed Delaware's.[84]  Ultimately, *Ascension* enforced the principles animating Restatement Section 187—that is, to "prevent parties from contracting around the law of the default state by importing the law of a more contractarian state, unless that second state also has a compelling interest in enforcement."[85]

"Delaware law upholds the freedom of contract and enforces as a matter of fundamental public policy the voluntary agreements of sophisticated parties."[86]  This is especially true when sophisticated parties select Delaware law as a "common language" to set forth a "reliable and fair set of rules for their commercial relationship."[87]  But, at this stage, I question whether Delaware's policy interest in upholding a *lingua franca* for sophisticated commercial parties is squarely implicated.[88]  In any event, as noted, even if Delaware's contractarian affinities were at stake, Alabama's interest in preserving its citizens' access to professionals' services is likely more imperative.  Given these conclusions, I answer Section 187's

---

[84] *Ascension*, 2015 WL 356002, at *5.

[85] *Id.*

[86] *NAACO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 35 (Del. Ch. 2009).

[87] *Abry P'rs V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1047 (Del. Ch. 2006).

[88] Here, the relevant non-compete is contained in the Grant Agreement—a contract in which Mr. Hamilton received membership units in a Delaware LLC.  Yet, as noted many times here, Fast Pace has declined to assign a value to these units.  Chaney Aff. Ex. 42 at 11–12 (Interrogatory No. 7).  As it stands, the record supports a reasonable inference that Fast Pace's new private equity owners swept in and imposed draconian non-competes on Company employees in exchange for minimal consideration.

third question—whether Alabama's policy interests likely outweigh Delaware's interest in enforcing contracts—in the affirmative. Accordingly, when coupled with the non-compete's suspect status under Delaware law, I find Fast Pace does not have a reasonable probability of success regarding its claim for specific performance of the Grant Agreement's non-compete.

## B. The LLC Agreement's Business Opportunity Provision

Fast Pace maintains the Hamiltons were obliged under Section 15 of the LLC Agreement to ask Fast Pace whether it wanted to open an Alabama urgent care clinic before they could open one themselves.[89] Having failed to direct the opportunity to Face Pace, it is alleged the formation and development of Thrive violated Section 15.5.

Here again, the Hamiltons raise a procedural defense they say obviates any need to address Fast Pace's claim on the merits—namely, that Fast Pace did not seek injunctive relief in connection with Section 15.5.[90] In this regard, the Hamiltons persuasively argue that Fast Pace's failure to put them on notice that it would seek an injunction in connection with its claim under Section 15.5 has created unfair

---

[89] POB at 18–32.

[90] DAB at 53 (citing Compl. ¶¶ 139–46 (seeking money damages)); *The Ravenswood Inv. Co. L.P. v. Estate of Winmill*, 2016 WL 3635574, at \*4 (Del. Ch. June 29, 2016) ("The purpose of a complaint is to place a defendant on notice of the claims against him and of the relief the plaintiff seeks from the Court.").

prejudice because they took no discovery in aid of defending this claim during the "injunction discovery."[91] While this argument might be an independent basis to deny the Motion, I press on since Fast Pace's arguments likely will fail on the merits.

Section 15.5 of the LLC Agreement establishes a contractual restriction commensurate with a common law corporate opportunity restriction that requires a member to bring opportunities "he or she *believes* would qualify as an investment or business opportunity [for Fast Pace]" to the Company's board of managers.[92] As clearly reflected in the contract language, the obligation hinges on the members' *subjective* perception of whether the opportunity would be a corporate opportunity for Fast Pace.[93] The Hamiltons have presented credible evidence that Fast Pace historically opted to avoid doing business in Alabama because of its heightened regulatory burdens.[94] This strategic decision raises real questions whether the Hamiltons would have subjectively considered a Florence, Alabama urgent care clinic to be a Fast Pace opportunity.

Another, more fundamental, question is whether Thrive represents a Fast Pace "business opportunity" as referenced in the LLC Agreement, regardless of the

---

[91] DAB at 53.

[92] LLC Agreement § 15.5.

[93] *Id.*

[94] Cragg Aff. Ex. 59. (Fast Pace executives were "not sure about Alabama economics.").

Hamiltons' subjective beliefs. As with other key terms in the operative agreements, "business opportunity," as used in Section 15.5, is undefined.[95] Under Delaware law, a corporate opportunity is a business prospect "presented to a corporate officer" that the company (i) "is financially able to undertake," (ii) within the company's "line of business," (iii) in which the company has "an interest or expectancy" and (iv) that, by taking, a fiduciary "will be placed in a position inimicable to his duties to the corporation."[96]

At this stage, it does not appear the Thrive opportunity was ever "presented" to Mr. Hamilton while he was employed at Fast Pace. Instead, it appears Mr. Hamilton hatched the idea on his own, likely while working for Fast Pace, left Fast Pace and then pursued the idea after his employment terminated.[97] Given these facts, this is not the "typical corporate opportunity case" as recognized under our

---

[95] *See Obeid v. Hogan*, 2016 WL 3356851, at *6–7 (Del. Ch. June 10, 2016) (drawing "analogies to corporate law" when "the Corporate LLC Agreement substantially re-creates the governance structure of a Delaware corporation using language drawn from the corporate domain").

[96] *Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 154 (Del. 1996).

[97] *See, e.g.*, Chaney Aff. Ex. 10 (Mr. Hamilton's April 10, 2019 correspondence inquiring into "[w]hat/who is a good resource to figure out NP reimbursement in Al?"), Ex. 15 (Mr. Hamilton's April 10, 2019 correspondence "trying to figure out if a business is worth trying for an NP").

31

law.[98]  With this in mind, it is unlikely, based on this record, that Fast Pace will succeed on its claim under Section 15.5.

## C. Breach of Fiduciary Duty

As a final fallback, Fast Pace alleges Mr. Hamilton was a fiduciary while working at Fast Pace and his scheme to form Thrive as a Fast Pace competitor was a breach of his fiduciary duty of loyalty.[99]  To prove a breach of fiduciary duty, a plaintiff must demonstrate the defendant actually owed fiduciary duties.[100]  Based on this record, it is not reasonably probable that Fast Pace will meet this threshold burden.  Holdings is a manager-managed LLC.  While Mr. Hamilton worked for Holdings, he was not one of its managers.[101]  Mr. Hamilton's status as an employee, or even as a *member* of Holdings, cannot give rise to fiduciary duties in a manager-managed LLC, unless Mr. Hamilton exercised *actual control* over Holdings.  For obvious reasons, Fast Pace does not attempt to make that showing with respect to Mr. Hamilton.

---

[98] *Carlson v. Hallinan*, 925 A.2d 506, 538 (Del. Ch. 2006).

[99] POB at 28–32.

[100] *Basho Tech. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*, 2018 WL 3326693, at *25 (Del. Ch. July 6, 2018).

[101] LLC Agreement §§ 6.3–6.4.

## D. Non-Solicitation

Fast Pace alleges Mr. Hamilton breached his non-solicitation obligations in two ways. *First*, in 2019, Mr. Hamilton hired a nurse practitioner, Theresia Roach, who last worked for Fast Pace in 2016.[102]  *Second*, Mr. Hamilton "solicited other current and former employees" by "invit[ing] Facebook friends . . . to 'like' Thrive's Facebook page."[103]

Under Delaware law, a non-solicitation covenant is enforceable if it "(1) meets general contract law requirements, (2) is reasonable in scope and duration, (3) advances a legitimate economic interest of the party enforcing the covenant, and (4) survives a balance of the equities."[104]  To breach a non-solicitation provision, conduct must fall within the prohibition's terms.[105]

The Grant Agreement prohibits Mr. Hamilton from "hir[ing] . . . any Person who was an employee . . . of [Fast Pace] . . . within one year prior to [December 5, 2016]."[106]  Accordingly, by hiring Ms. Roach, Fast Pace has a reasonable probability

---

[102] POB at 54.

[103] *Id.* at 55.

[104] *Kan–Di–Ki*, 2015 WL 4503210, at *19.

[105] *See, e.g.*, *KPMG Peat Marwick LLP v. Fernandez*, 709 A.2d 1160, 1164 (Del. Ch. 1998) (finding that various contacts, including a phone call to invite a former-client to a conference, did not violate the terms of a non-solicitation covenant).

[106] Grant Agreement § 8.

of demonstrating Mr. Hamilton has breached the Grant Agreement's non-solicitation provision, as written.

But Fast Pace does not identify what legitimate economic interest it has in preventing Thrive from employing Ms. Roach. Courts have held that an employer's interest in preserving its goodwill and confidential information is legally cognizable.[107] Yet the loss of a single nurse practitioner, who has not worked at Fast Pace since 2016, does not implicate these (or any other) legitimate economic interests. This is true even if, as Fast Pace contends, Ms. Roach had recently applied to work for Fast Pace again.

Here, if I were to order Thrive to cease employing Ms. Roach, I would be depriving a non-party of her employment without advancing any interest Fast Pace is entitled to protect.[108] Accordingly, as relates to Ms. Roach, the Motion cannot be granted because Fast Pace lacks a reasonable probability of demonstrating the non-solicitation advances a legitimate economic interest.

Fast Pace's assertion that Mr. Hamilton breached the non-solicitation when he invited Company employees to "like" Thrive's Facebook page likewise lacks merit. The Grant Agreement prohibits Mr. Hamilton from "directly or indirectly"

---

[107] *Elite Cleaning Co., Inc. v. Capel*, 2006 WL 1565161, at *4 (Del. Ch. June 2, 2006).

[108] *Id.* ("Courts also consider whether restrictions . . . would work an undue hardship.").

inducing any employee "to leave the employ or engagement" of Fast Pace or otherwise "interfere" with Fast Pace's relationship with its employees.[109] At this stage, Fast Pace has not shown how a Facebook invitation, inviting individuals to "like" Thrive's Facebook page, is an attempt to "induce" any employee to leave Fast Pace's employ or to interfere with the employment relationship.[110] Accordingly, Fast Pace is not entitled to an injunction enforcing the non-solicitation covenant because it has failed to show Mr. Hamilton's Facebook posts breached that provision.

* * * * *

In summary, Fast Pace does not have a reasonable probability of success on the merits of its claims that Mr. and Mrs. Hamilton breached (i) the Grant Agreement's non-compete, (ii) the business opportunity restriction in the LLC Agreement (iii) the fiduciary duty of loyalty or (iv) the Grant Agreement's non-solicitation covenant. These are the only claims Fast Pace advances in support of its extraordinary request that I enter an order shutting Thrive down until trial. The Motion must be denied to the extent it seeks this relief.

---

[109] Grant Agreement § 8.

[110] Chaney Aff. Ex. 45.

35

## E. Confidentiality

From what I gathered at Oral Argument, the parties' disputes regarding confidential information appear to have narrowed. At this stage, the Hamiltons do not argue their obligations under the confidentiality restrictive covenant are unenforceable. Moreover, in their Answering Brief, the Hamiltons agreed to destroy all written information Mr. Hamilton obtained from Fast Pace.[111] In light of this concession, I will enter an Order with the following elements. *First*, Mr. Hamilton will identify and return whatever Fast Pace confidential information he believes he has. *Second*, Fast Pace can review the information Mr. Hamilton identifies and raise a challenge if it deems the list is incomplete or inaccurate. *Third*, if necessary, the Court can decide any remaining disputes.

## F. The Anti-Suit Injunction

Finally, Fast Pace seeks a broad anti-suit injunction preventing Mr. Hamilton from engaging in further litigation relating to the Grant and LLC Agreements in the Alabama court based on the forum selection provisions in those agreements.[112] This aspect of the Motion fails for two reasons. *First*, it is unclear what, exactly, Fast Pace seeks to enjoin given that the Alabama court has already dismissed

---

[111] DAB at 49 n.24.

[112] Proposed Order ¶ 4.

36

Mr. Hamilton's "claims against [Holdings] and [FPMCM] arising from the Grant Agreements."[113]  *Second*, Fast Pace has waited too long to invoke equity, and the request is barred by laches.

When Fast Pace filed the original complaint in this Court on December 23, 2019, it did *not* seek an anti-suit injunction with respect to the Alabama action when it brought its motion for a TRO.[114]  Instead, it engaged with Mr. Hamilton in Alabama by bringing a motion to dismiss there and then opposing a motion for summary judgment.[115] The Alabama court has decided both motions.[116] After losing some aspects of the motions and winning others, Fast Pace *now* asks this Court to prevent any further litigation in Alabama relating to the agreements that are at issue in Delaware.  Against the backdrop of this court's general "reticence" to grant anti-suit injunctions, Fast Pace's delay is particularly troublesome.[117]

---

[113] Alabama Order ¶ 2(g).

[114] *See* Proposed TRO.

[115] Chaney Aff. Ex. 29 (Mr. Hamilton's Mot. for Summ. J.), 30 (Fast Pace's Mot. to Dismiss), 31 (Fast Pace's Mot. to Stay).

[116] *See* Alabama Order.

[117] *See Carlyle Inv. Mgmt. L.L.C. v. Nat. Indus. Gp. (Hldg.)*, 2012 WL 4847089, at *5, *7 (Del. Ch. Oct. 11, 2012) (noting this court's "reticence to grant an anti-suit injunction" based on "typical court-to-court comity" and observing "[i]t is certainly true that this court does not lightly grant anti-suit injunctions").

If Fast Pace wanted an anti-suit injunction specifically enforcing contractual forum-selection provisions favoring Delaware, it should have sought a TRO in this court before the Hamiltons, and the Alabama court, expended invaluable resources litigating and adjudicating, respectively, its legal arguments in Alabama. It comes with ill grace to seek equity's intervention in this Court now.

## III. CONCLUSION

For the foregoing reasons, the Motion is **DENIED**, except to the limited extent it seeks to enforce the confidentiality provisions in the Grant and LLC Agreements. As to those aspects of the Motion, the parties should proceed as directed above. Defendants shall submit a conforming form of Order, on notice to Plaintiffs, within five (5) days.